UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF:

THREE CELLPHONES CURRENTLY
LOCATED WITH ATF AT 90 K STREET,
NORTHEAST, WASHINGTON, D.C.

Mag. No. _____

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
UNDER RULE 41 FOR A WARRANT TO SEARCH THREE CELLPHONES**

I, Rebekah Moss, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) (hereinafter known as the "affiant") being duly sworn, deposes, and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for three cellphones (Target Cellphones 1, 2, and 3) (as described in Attachment A and incorporated herein by reference) based on probable cause that the target cellphones contain evidence of violations of 21 U.S.C. §§ 841, 846 (drug trafficking offenses) and 18 U.S.C. §§ 922(g), 924(c) (firearms and ammunition offenses) (collectively, the "target offenses"), as well as, evidence of identification, that would further establish the Defendant's commission of the target offenses (as described in Attachment B and incorporated herein by reference).  The target cellphones are currently in the possession of ATF at 90 K Street, Northeast, Washington, D.C.

2.      I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510 (7), that is, an officer of the United States who is empowered by

law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.  I have been a Special Agent with ATF since May 2014, and a sworn law enforcement officer for over eleven years. I am currently assigned to the ATF Washington Field Division, High Intensity Drug Trafficking Area (HIDTA) group, which is tasked with investigating violent and drug-related crime.

4.  I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

5.  Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their drug trafficking operations. Through my experience, I am also aware that narcotics traffickers possess firearms to assist them in the trafficking of narcotics. Firearms are used by drug traffickers for protection and intimation and they are maintained in secure places, such as, residences, stash houses, and vehicles. In addition, drug traffickers travel with their firearms when outside their residences.

6.  Since this affidavit is being submitted for the limited purpose of obtaining a search warrant for cellphones, I have not set forth each and every fact learned during the course

of this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrant. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers which I have read and reviewed, and, in part, upon information and belief. The sources of my information and belief include, but are not limited to: a) oral and written reports regarding this and other investigations which I have received, directly or indirectly, from agents of the ATF, and other law enforcement officers; and b) physical surveillance conducted by your affiant and other agents and officers who have reported to me directly or indirectly.

### AFFIANT'S KNOWLEDGE, TRAINING, AND EXPERIENCE RELATING TO CELLULAR PHONES

7. Based on your affiant's knowledge, training, and experience, a cellular telephone, a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal

calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet. Similarly, information that has been viewed via the Internet is typically stored for some period of time on the device. Even when a user deletes information from a cellular phone, it can sometimes be recovered with forensics tools.

        8.      In your affiant's training and experience, examining data stored on cellphones can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Your affiant also knows that those involved in criminal activities take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their products, on cellular telephones.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

        9.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

        a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

      b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

      d.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.

Any pre-defined search protocol would only inevitably result in over-or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

### AFFIANT'S KNOWLEDGE OF CELLPHONES REGARDING THE TRAFFICKING OF NARCOTICS AND THE POSSESSION OF FIREARMS

10. Based on your affiant's knowledge, training, and experience, and in the knowledge, training, and experience of other members of ATF, cellphones are tools of the narcotics trade. Narcotics traffickers communicate with customers, suppliers, and coconspirators via cellphones. Narcotics traffickers use cellphones to arrange meetings, request narcotics, take narcotics orders, and arrange for coconspirators to obtain and distribute narcotics. To avoid detection by law enforcement, drug traffickers commonly use more than one cellphone and often send text messages, rather than engage in oral communications.

11. Cellphones used by narcotics traffickers contain valuable information and evidence relating to their narcotics trafficking. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking of narcotics; (ii) identify locations where narcotics traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cellphones by the narcotics traffickers; (iv) document meetings and communications between narcotics traffickers, their customers,

associates, and coconspirators; (v) reflect communications between narcotics traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between narcotics traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

12. As discussed above, many cellphones have picture-taking devices on them. My law enforcement training and experience indicates that drug-dealers like to take pictures or videos of themselves, their drugs, the money made from selling drugs, and the persons with whom they work, that is, with whom they sell drugs. Moreover, people who possess firearms also like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends. They will use a camera, cell phone with a camera, tablets with a camera and or personal computers to photograph and store photograph of firearms or themselves holding the firearm and other criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal gun possession. Moreover, cellphones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.

## PROBABLE CAUSE

13. On October 11, 2017, at approximately 2:15 p.m., ATF agents (including your affiant) and an ATF Metropolitan Police Department (MPD) Task Force Officer (TFO)

7

conducted surveillance in the 2400 block of Southern Avenue, S.E., Washington, D.C. While in the area, agents observed an individual, who later identified himself as Delonta Phillips (hereinafter referred to as the "Defendant"), walk out the front door of 3468 24th Street, S.E., Washington, D.C. Agents immediately recognized this individual as the Defendant based on a prior booking photograph of the Defendant. Agents were aware that the Defendant had an open D.C. Superior Court arrest warrant for distribution of a controlled substance. Agents were also aware that the Defendant had another arrest warrant for a parole violation. While law enforcement approached the Defendant, the Defendant quickly entered the driver's side door of a burgundy Cadillac Deville, bearing Washington, D.C. license plate NAT1639. The Defendant was the sole occupant of the vehicle.

14. ATF TFO Kevin McConnell, wearing his MPD neck badge, approached the driver's side of the Defendant's vehicle, and identified himself as law enforcement and requested to speak with the Defendant. TFO McConnell then knocked on the driver's side window of the Defendant's vehicle in order to further get his attention. The Defendant looked over at TFO McConnell, locked the doors, stared straight ahead, and started the vehicle. The Defendant put the vehicle in drive momentarily before reversing out of his parking space away from TFO McConnell. Agents then observed the vehicle travel southbound on 24th Street, S.E. toward Southern Avenue, S.E. Agents immediately followed the Defendant's vehicle and put out a vehicle description over the radio. Agents observed the vehicle turn left onto Southern Avenue, S.E., right on Naylor Road at Suitland Parkway, left on Suitland Parkway (eastbound), exit onto Suitland Road off ramp, make a left onto Suitland Road, and come to a stop in the 3700 block of Regency Parkway.

15. During all times pursuing the Defendant, agents never lost sight of his vehicle, with the exception of momentary bends in the road, and never saw any other individual inside the vehicle or any other person enter or exit the vehicle. Agents observed the Defendant exit the front driver's side door of the vehicle and flee on foot into the woods. Agents observed the Defendant drop down into a ravine directly in front of the Defendant's vehicle. One agent remained with the vehicle while law enforcement immediately set-up a perimeter around the ravine to prevent his escape. While securing the vehicle, agents observed a blue and black backpack on the driver's side floor of the backseat. Prior to opening the backpack, TFO McConnell immediately felt a weighted down object consistent with the imprint of a firearm. Inside the backpack, agents recovered a Glock 26, 9mm-caliber firearm, bearing serial number LPF625, with an extended magazine containing 28 rounds of ammunition (no round in the chamber). Law enforcement also observed half of a mason jar and full gallon ziploc bag of a substance consistent in smell and texture to that of marijuana. While law enforcement agents and officers pursued the Defendant from the abandoned vehicle, your affiant remained with the vehicle and coordinated law enforcement's response from multiple law enforcement agencies, which included the deployment of a law enforcement helicopter.

16. At approximately 3:15 p.m., law enforcement observed the Defendant hiding underneath a ledge in the ravine. At approximately 3:21 p.m., the Defendant was placed under arrest without further incident. After being apprehended hiding under a ledge in the ravine, law enforcement searched the area and recovered a cellphone and a men's sneaker that was lost by the Defendant when he entered the ravine. This cellphone was a white Samsung cellphone, model SM-J700P, bearing HEX number 35562807366598 (Target Cellphone 1). After exiting

9

the ravine, the Defendant stated that he was suffering from chills and pain in his foot. The Defendant was then transported to United Medical Center under law enforcement supervision. Upon his arrival, the Defendant's personal items were gathered, which included $408 in United States currency, jewelry, and two additional cellphones. These two cellphones were a black Coolpad cellphone, model 3622A, bearing FCC ID number R38YL3622A (Target Phone 2) and a black iPhone, model A1661, bearing FCC ID number BCG-E3087A (Target Phone 3).

17. While at the hospital, the Defendant was permitted to make a phone call on a cellphone that was provided to him by the law enforcement agent that was guarding him. During the course of the Defendant's phone call, the agents overheard the Defendant tell the recipient of the call that "they got me with the gun." Law enforcement subsequently determined that the subject firearm had been reported stolen by the Anne Arundel County (Maryland) Police Department.

18. Law enforcement subsequently interviewed the registered owner of the subject vehicle, hereafter, "Witness-1." Witness-1 told law enforcement agents that he sold the "burgundy Cadillac" to an individual, who identified himself as "Terrance" or something. Witness-1 described the Defendant as having dreads, approximately "5'9-5'10," approximately 25-30 years old, and less than 200 lbs. Witness-1 stated that he sold the vehicle on October 10, 2017 between 12:00 p.m. and 3:00 p.m. for $2,500.00 in U.S. currency. Agents showed Witness-1 a photograph of the Defendant. Witness-1 positively identified the Defendant as the person to whom he sold the "burgundy Cadillac." Witness-1 told the agents that he removed all of his property from the "burgundy Cadillac" prior to the sale. Witness-1 also stated that he communicated with the Defendant by telephone to set up the purchase of the vehicle sale.

19. Based on a review of the Defendant's criminal history, the Defendant has two prior convictions for offenses punishable by a term of imprisonment exceeding one year. The Defendant was convicted of unlawful possession of a firearm in District of Columbia Superior Court case no. 2014-CF2-10883 and carrying a pistol without a license (outside a home or place of business) in District of Columbia Superior Court case no. 2011-CF2-731. The Defendant also has numerous adjudications with the criminal justice system for drug trafficking and firearms offenses prior to becoming an adult.

20. On October 12, 2017, based upon the aforementioned facts, United States Magistrate Judge Deborah A. Robinson signed a complaint (17-mj-00738-DAR) that charged the Defendant with a violation of 18 U.S.C. § 922(g) based on his possession of a firearm and ammunition after having been convicted of crimes punishable in excess of one year.

21. On October 12, 2017, ATF law enforcement agents towed the subject vehicle from Maryland to a secure ATF facility located at 90 K Street, Northeast, Washington, D.C. so that ATF could apply for a search warrant for authorization to search the full contents of the abandoned vehicle, including a full search of the referenced bag that contained the loaded firearm and suspected marijuana.

22. On October 13, 2017, based upon the aforementioned facts, United States Magistrate Judge Deborah A. Robinson signed a search warrant (17-mj-00748-DAR) that authorized law enforcement to search the vehicle for evidence relating to firearms and ammunition offenses, in violation of 18 U.S.C. §§ 922(g), 924(c), and drug trafficking offenses, in violation of 21 U.S.C. §§ 841, 846.

23. Pursuant to the search warrant, law enforcement conducted a full search of the

aforementioned bag that contained the firearm and marijuana. Law enforcement recovered a digital scale and a razor used for the cutting of narcotics, and determined that the total weight of the marijuana *with* packaging was 511.7 grams (approximately half a pound *without* packaging).

24. Based on your affiant's knowledge and experience, the quantity of the marijuana, in addition to the drug paraphernalia of a scale and razor (which could be used to measure and cut the marijuana) and the $408 in United States currency found on the Defendant, established that the possession of the marijuana in the vehicle was more consistent with an intent to distribute than solely possession for personal use.

25. The Defendant possessed a distribution quantity of marijuana in his vehicle with the tools of drug trafficking, a digital scale, a razor, a firearm for protection and/or intimation, and cellphones to contact potential customers and distributors. All of the items, including target cell phones 1, 2, and 3, were accessible to the Defendant in the vehicle. Moreover, when the Defendant abandoned the vehicle, he took target cell phones 1, 2, and 3 with him. In addition to potentially containing evidence of drug trafficking and gun possession, one or more of the target cellphones are likely to have information to corroborate the Defendant's communications with Witness-1 regarding the Defendant's acquisition of the subject vehicle the day prior to the Defendant's arrest.

## **CONCLUSION**

26. Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that target cellphones 1, 2, and 2 (as described in Attachment A and incorporated herein by reference) contain evidence of drug trafficking offenses, in violation of 21 U.S.C. §§ 841, 846 and firearms and ammunition offenses, in violation of 18 U.S.C. §§ 922(g),

924(c) (collectively, the "target offenses"), as well as, evidence of identification, that would further establish the Defendant's commission of the target offenses (as described in Attachment B and incorporated herein by reference).

27. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

28. I further request that the Court permit the search warrant to be executed at any time given that the target cellphones are contained on the premises of ATF in Washington, D.C. as noted in Attachment A.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Rebekah Moss, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn and subscribed to before me this _____ day of October, 2017.


_____
Deborah A. Robinson,
United States Magistrate Judge
For the District of Columbia

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

**ATTACHMENT A-1 (Target Phone 1)**

A white Samsung cellphone, model SM-J700P, bearing HEX number 35562807366598 that is currently located at ATF's secure facility at 90 K Street, Northeast, Washington, D.C.

**ATTACHMENT A-2 (Target Phone 2)**

A black Coolpad cellphone, model 3622A, bearing FCC ID number R38YL3622A that is currently located at ATF's secure facility at 90 K Street, Northeast, Washington, D.C.

**ATTACHMENT A-3 (Target Phone 3)**

A black iPhone, model A1661, bearing FCC ID number BCG-E3087A that is currently located at ATF's secure facility at 90 K Street, Northeast, Washington, D.C.

**ATTACHMENT B**

PROPERTY TO BE SEIZED

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, used in the commission of a narcotics trafficking offense in violation of 21 U.S.C. §§ 841(a)(1), 846 and the commission of a firearms offense, in violation of 18 U.S.C. § 922(g)(1), 924(c) (collectively, the target offenses), including, but not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

(i) establishing or documenting the commission of the target offenses;

(ii) identifying locations where the individual committed the target offenses, traveled to before and after the commission of the target offenses, and in preparation for the target offenses;

(iii) reflecting the ownership and use of the items identified in Attachment A by the individual committing the target offenses;

(iv) documenting meetings and communications between individuals committing one or more of the target offenses;

(v) reflecting communications between the individual committing one or more of the target offenses and other individuals, discussing the commission of one or more of the target offenses;

(vi) reflecting communications between the individual committing one or more of the target offenses and other individuals who may have assisted or provided support in the commission of one or more of the target offenses;

(vii) containing photographs or video that would constitute evidence of a violation of the target offenses;

(viii) documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of 21 U.S.C. § 841(a)(1), which would constitute evidence of one of the target offenses; and

(ix) documenting or containing evidence of the purchase of items from the assets derived from the commission of a narcotics trafficking offense in violation of 21 U.S.C. § 841(a)(1), which would constitute evidence of one of the target offenses.